IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ANGELA KITCHENS, | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 2:16-cv-01232-LSC |
| JEFFERSON COUNTY BOARD OF EDUCATION, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OF OPINION

## I.    INTRODUCTION

Plaintiff Angela Kitchens ("Kitchens") brings this action against her employer, Jefferson County Board of Education ("the Board"), alleging that she suffered discrimination on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Before this Court is the Board's Motion for Summary Judgement. (Doc. 14.) For the reasons explained herein, the Board's motion is due to be GRANTED.

## II.    FACTUAL BACKGROUND

### A. SUMMARY OF RELEVANT FACTS

Kitchens is a physical education teacher at McAdory Middle School (the "Middle School") and has been employed by the Board since 2004. In addition to teaching, Kitchens was the head softball coach at the Middle School and the assistant volleyball coach at McAdory High School (the "High School"); she is also a school bus driver. In May 2015, Jennifer Smith ("Smith"), the head varsity softball coach at the High School, informed Brent Shaw ("Shaw"), who was the principal of the High School at the time, that she was not going to continue coaching softball in the following school year. In order to hire a new varsity softball coach for the High School, Shaw "posted" the position on "SearchSoft," which is an intranet system used by the Alabama Department of Education. Shaw eventually received three applications for the position from (1) Kitchens, (2) Joshua Coffelt ("Coffelt"), and (3) K.R. Battles ("Battles"). At the time of the application, Coffelt was a science teacher as well as the assistant varsity softball coach and the assistant boys' basketball coach at the High School. Battles was an English teacher and the head varsity volleyball coach at the High School.

After conducting an initial round of interviews with other employees of the Board, Shaw chose Coffelt to be the interim varsity head softball coach for the High School during the summer. Prior to this recommendation, Shaw had informed his superior that he had been hired to be a principal at a different high school. Shaw

wanted the new principal for the upcoming year to make a final hiring decision for the softball coach position.

Tod Humphries ("Humphries"), a former assistant principal at Pleasant Grove High School, was chosen to be the new principal at the High School in July 2015. Humphries interviewed the same three candidates and received recommendations from Shaw, Kane, Powell, and Storie about who they thought should have the position. He ultimately decided to hire Coffelt as the varsity softball coach and informed Kitchens of his decision on or about August 6, 2015.

Kitchens then filed a charge with the Equal Employment Opportunity Commission ("EEOC") on September 25, 2015, alleging she was not selected to be the head softball coach on account of her sex. She was mailed her right to sue letter from the EEOC on May 2, 2016, and then instituted this suit.

### B. HIRING PRACTICES BY THE BOARD AND AT THE HIGH SCHOOL

The Board has no standard process for the hiring of coaches for the schools in the district. Instead, the principal of each school is given discretion to post jobs, conduct interviews, and make initial hiring recommendations. (Storie Depo. at 19.) The Board typically only advertises head varsity football or basketball coaching positions, as these positions have a teaching position attached to them. *Id.* For other coaching positions, the general practice is for the school administrator to first

look to current faculty of the school to fill the position, but teachers are often hired from other schools to fill coaching vacancies. *Id.* at 19-20. At the High School in 2015, there were coaches who taught at other schools in the Jefferson County school system. The Board's only qualification to be a coach was for the applicant to have a teaching certificate. (Doc. 16. ¶ 4.)

Once a principal makes hiring decisions for coaches, he submits a list of his selections to the Board so they may receive a monetary supplement for coaching. Upon the principal's submission, the Board's athletic department reviews the candidates and assigns them a supplemental salary based on an internal pay schedule. (Storie Depo. at 27.) The athletic department gives the list to the Board's human resources department, who forwards the list to the superintendent who in turn recommends the coaches to the Board for approval. Once approved, the coaches receive a supplemental salary for performing their coaching duties. In Kitchens' case, the Board did not independently investigate or interview any of the candidates for the position. (Doc. 16 ¶ 14.) In regards to Board approval of principals' coaching assignments, the director of athletics, Ken Storie ("Storie"), does not recall an instance where a principal's recommendation for a coaching supplement was denied by the Board. (Storie Depo. at 33.)

## C. THE SHAW INTERVIEW

The first interview of candidates for the head varsity softball coach position was conducted by Shaw, David Powell ("Powell"), Kim Kane ("Kane"), and Storie. At the time of the interview, Shaw was principal of the High School, Powell was the High School Athletic Coordinator; Kane was the Board Athletic Department Supervisor; and Storie was the Board Athletic Director, among other roles. (Doc. 16 ¶ 5.) The interview began with the same six questions that were asked to each applicant, followed by an opportunity for the interviewee to ask questions or make additional statements. (Kane Aff. ¶ 4.) The four interviewers took notes on the interviewees' answers and additional questions the interviewers wished to ask the interviewees.

One of the six questions asked to each applicant was "[w]alk us through a typical practice, beginning at 3:00." (Kane Aff. Ex. A.) As summarized by Kane's notes for the interview, Kitchens answered that the running, stretching, and throwing part of the practice would be directed by an assistant, as Kitchens would be driving her bus route. (Kane Aff. ¶ 4, Ex. A.; Kitchens Depo. at 85.) Kitchens' bus route generally ran from 2:55 PM when she left the Middle School to 3:45 PM when she returned to the Middle School and conducted a post-trip inspection of the bus. (Kitchens Depo. at 56-58.) Both Storie and Shaw's interview notes indicate concern with Kitchens' bus route. (Storie Depo., Ex. 3 "Follow up . . .

*Plans to continue bus route."; Shaw Aff. ¶ 13, Ex. A "Any questions: [Kitchens] [b]rings up bus route. She [Kitchens] plans to still have bus route.") Coffelt did not drive a bus at the time of his interview or hiring. (Humphries Aff. ¶ 6.)

The interviewers also asked about the interviewee's previous experience in athletics, with a specific focus on softball. Kitchens listed her extensive experience playing and coaching softball. She played softball while attending the University of Alabama-Huntsville. (Kitchens Aff. ¶ 1.) Before applying for the coaching position at the high school, she had previously been the head softball coach at Calera High School, Shades Valley High School, Bragg Middle School, Bob Jones High School, and co-coached varsity softball at Limestone High School. *Id.* Kitchens was the head softball coach of the Middle School's team since 2006. *Id.* at ¶ 2.

As the assistant coach for the High School varsity softball team for the past two years, Coffelt also had requisite coaching experience in softball, although it does not appear that he had ever played softball. (Smith Aff. ¶ 3.) The outgoing head coach of the softball team, Smith, informed Powell and Shaw that she did not receive any complaints about Coffelt when he was her assistant coach and that "he was ready to be the head varsity softball coach." (Smith Aff. ¶ 8.)

After conducting the three interviews, Shaw, Powell, Kane, and Storie all felt that Coffelt should be hired as the varsity softball head coach. Storie recommended

Coffelt because he thought that Coffelt was the best fit for the school's students and the program. Specifically, Storie liked that Coffelt was already familiar with the team. (Storie Depo at 105.) Storie additionally felt that Coffelt was a better choice because Coffelt worked at the High School. *Id.* at 106. The High School runs on a five-period day, and the fifth period is often designated for athletics. Varsity coaches at the High School were able to begin practice during the fifth period, thus allowing the team to complete practice earlier. *Id.* at 106. Storie felt that early practices were advantageous because it allowed the players to return home, focus on their studies, and rest. *Id.* In relation to Kitchens, who worked at a different school with a different schedule and drove a bus, Storie believed Coffelt would be able to begin practice hours earlier. Adding to the chances of scheduling problems, Kitchens' employment at the Middle School would not allow her to coordinate as easily with the administrators at the High School and could potentially lead to issues scheduling games with other coaches during playoffs. *Id.* at 108.

Storie felt that Kitchens appeared "haughty" during the interview; as though she "felt like she was owed the position." *Id.* at 109. Additionally, when asked about her position as an *assistant* varsity volleyball coach, Kitchens stated that she actually ran the program. *Id.* Storie felt that Kitchens had overstated her role because the program was actually headed by another coach, Ms. Battles. *Id.*

Shaw, Powell, and Kane also recommended Coffelt over Kitchens for the same reasons as Storie. They felt that Kitchens' answer that she would miss part of practice due to her bus route put her at a disadvantage to Coffelt, who would be able to conduct early practices and attend games. (Kane Aff. ¶ 6; Powell Aff. ¶ 6; Shaw Aff. ¶¶ 19-20.) Coffelt was at the High School, whereas Kitchens was at the Middle School. (Kane Aff. ¶ 6; Powell Aff. ¶ 6; Shaw Aff. ¶ 20.) Kane felt that Kitchens came across in the interview as if she felt that she was "entitled to the job and should not have been interviewed." (Kane Aff. ¶ 7.) Shaw essentially echoes Kane's opinion of Kitchens: he felt that Kitchens did not appear to be a "team player" and that Coffelt had a better interview than Kitchens. (Shaw Aff. ¶ 20.) Shaw and Powell also added that Smith, the former coach, had recommended Coffelt to be the new varsity head coach. *Id.*

Kitchens herself felt that the interview was poorly conducted. She stated that the interviewers did not appear to be "sincere or concerned about the program." (Kitchens Depo. ¶¶ 82, 93.) Kitchens could not recall whether she was asked about the bus route during the interview, but admitted that if she discussed the bus route, it would be in relation to the scheduling of practices. (Kitchens Depo. ¶ 88.) She also disputed the four interviewers' characterization of her answer about her role on the volleyball team. According to Kitchens, her answer that she "basically . . .

run[s] the program" was in regards to a question of whether she had any experience running a sports program. (Kitchens Depo. ¶ 85.)

Kitchens stated that following the interview she texted Shaw to ask him if he would be appointing the new head varsity softball coach. She also wanted to know why no one had asked her during the interview whether she would be willing to give up the bus route. (Kitchens Depo. ¶¶ 97-98.) Shaw said that because he was leaving the school the next principal would decide who would be the head coach. *Id.* at 97. He also asked whether Kitchens would be willing to give up the bus route. *Id.* at 98. She answered "If I were able to be head softball and head volleyball." (Kitchens Depo. ¶ 98.)

### D. HUMPHRIES INTERVIEW

After becoming principal at the High School, Humphries was informed of the vacant softball coach position and the interviews of the three candidates conducted by Shaw, Storie, Kane, and Powell. He asked Kane to provide him with questions to ask the candidates and then re-interviewed Kitchens, Coffelt, and Battles by asking each of them identical questions to begin each interview. (Humphries Aff. ¶¶ 2-3)

Prior to Humphries' interview, Kitchens had contacted Craig Pouncey ("Pouncey"), the Board's superintendent, to ask him whether there was a Board

policy against driving a bus and being a head coach at the same time. (Humphries Depo. at 195-97; Kitchens Depo. at 102-03.) Pouncey told Kitchens that coaches are not *per se* disqualified by virtue of driving a bus route, although he understood the concern with Kitchens missing part of practice. (Kitchens Depo. at 103.) Pouncey allegedly told Kitchens that "I . . . could see that you could try it to see if it would work." (Kitchens Depo. at 103.) Humphries stated that Pouncey had later contacted him to relay the conversation Pouncey had with Kitchens and to tell Humphries that "this is your decision, but [Kitchens' bus route is] a problem." (Humphries Depo at 197.)

Because Humphries knew of Kitchens' conversation with Pouncey, he wanted to ask her during the interview about the bus route. (Humphries Depo. at 195, 197.) Humphries directly asked Kitchens whether she would give up the bus route, and Kitchens stated she would not. (Humphries Depo. at 198-99.) On the other hand, Kitchens gave contradictory statements about her interview with Humphries; she stated she does not remember or "can't recall" whether Humphries asked her to give up the bus route, although she "recall[ed] talking to him about how bus routes are a lot of money . . . we talked about the money issue of [bus routes]." (Kitchens Depo. at 115.) Kitchens stated that she told Humphries that she would have certain parts of the practice run by assistants, and generally

how she would structure the practice and have a bus route at the same time. (Kitchens Depo. at 113-14.)

Humphries told Kitchens that he was concerned her bus route would interfere with her responsibilities as head coach, specifically with the scheduling of practices and games. (Humphries Depo. at 198.) He likewise feared that he would set a precedent for other head coaches of major sports at the High School to begin driving buses if he hired Kitchens. (Humphries Depo. at 198-99; Kitchens Depo. at 113 ("He said he had concerns with the bus, that he needed to set a precedent, that he wanted all his varsity coaches at practice."); *see also* Humphries Depo. at 96-97 (specifying "basketball, football, softball, baseball, volleyball, and wrestling" as "major sports").) Kitchens stated that at the end of her interview, Humphries told her that she was the "most qualified candidate" but that he had concerns with her bus route. (Kitchens Depo. at 116.)

Humphries also felt that Kitchens had been overbearing in relation to her role as assistant volleyball coach. He stated that during his tenure as interim principal of the High School from 2013 to 2014, he became aware Kitchens had inappropriately been holding herself out as the "quasi head volleyball coach," when she was actually the assistant. (Humphries Depo. at 229-30.) Humphries stated that during the interview Kitchens appeared to ask him to give her the head

volleyball and softball coach positions in exchange for her giving up her bus route. (Humphries Depo. at 224.) He thought this was inappropriate to ask, since it would entail the firing of the current volleyball coach, Battles.

### E. DECISION TO HIRE COFFELT

After interviewing the three candidates, Humphries called Shaw, Powell, Kane, and Storie. Each recommended to Humphries that Coffelt become head varsity softball coach. (Humphries Aff. ¶ 11.)

Humphries felt Kitchens had inappropriately been holding herself out as the "quasi head volleyball coach," when she was actually the assistant. (Humphries Depo. at 229.) He states that he was aware of her making such statements while he was the interim principal at the High School from 2013 to 2014. (Humphries Depo. at 230.) Humphries felt during the interview that Kitchens acted as if she could schedule the practices whenever she wanted, and that this was inappropriate because ultimately the principal and superintendent have the final say in scheduling times for practice. (Humphries Depo. at 236.)

Humphries stated that he hired Coffelt over Kitchens because: (1) Kitchens would have to miss practice over the bus routes; (2) Kitchens was not a teacher at the High School; (3) in the interview she stated that she had wanted Battles to be

fired as head volleyball coach and replaced by her; and (4) Shaw, Powell, Kane, and Storie recommended Coffelt over Kitchens. (Humphries Aff. ¶ 12.)

Humphries also stated that he hired Coffelt because he had worked with Coffelt before, knew Coffelt to be a "stand-up person," and trusted him. (Humphries Dep. at 241.) Humphries additionally placed great weight on the recommendations of Shaw, who at one time was his assistant and who he knew to be reliable; as well as Kane, Powell, and Storie, who were involved in the Board's athletics department and were experienced. (Humphries Depo. at 242.)

Following Humphries' decision, Kitchens was in Humphries' office on an unrelated matter. Humphries stated that as Kitchens left the office, she popped her head back in the office and asked "It was the bus right?"; Humphries understood her question to be about his decision to hire Coffelt. Humphries stated he said that the bus route was "a big part of it." (Humphries Depo. at 200.) Kitchens related a contradictory version of this discussion, where she asked Humphries "was it the bus route?," and he answered "yes, it was *just* the bus route. It was not your performance at all." (Kitchens Aff. ¶ 9. (emphasis added).) During her deposition Kitchens said she spoke with Humphries in his office after finding out he hired Coffelt, and that he told her she was the most qualified candidate. (Kitchens Depo. at 118.)

## III.  STANDARD OF REVIEW

A motion for summary judgement is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence but must simply determine whether there are any genuine issues to be resolved at trial. *Anderson*, 447 U.S. at 249.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for

summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). "[T]he moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## IV.  DISCUSSION

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. §2000e-2(a)(1). Discrimination claims under Title VII are typically categorized as either single-motive or mixed-motive claims. *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1236 (11th Cir. 2016). Here, Kitchens has alleged only single motive discrimination.

A plaintiff can prove her discrimination claims by either direct or circumstantial evidence. *Id.* at 1236-37 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-102 (2003)). Where, as in Kitchens' case, a plaintiff attempts to prove intentional discrimination using circumstantial evidence, the Court applies the *McDonnell Douglas Corp. v. Green* burden-shifting framework to evaluate single-motive or "pretext" discrimination claims. *Id.* at 1238 n.7; *see also Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005) (per curiam).

Under *McDonnell Douglas*, the plaintiff carries the initial burden of producing circumstantial evidence sufficient to prove a *prima facie* case of discrimination. 411 U.S. 792, 802 (1973); *see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir. 1999). If the plaintiff meets her initial burden of establishing a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016), *cert. denied sub nom. Trask v. Shulkin*, 137 S. Ct. 1133, 197 L. Ed. 2d 176 (2017). If the defendant is successful, "the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." *Id.* (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010)).

## A. KITCHENS' PRIMA FACIE CASE OF SEX DISCRIMINATION

Although the *McDonnell Douglas* analysis typically starts with an examination of whether the plaintiff can make out a *prima facie* case of discrimination, the Board's motion does not contest Kitchens ability to do so. Thus, the Court will presume its existence for the purposes of the summary judgment motion and proceed immediately to the second step of the *McDonnell Douglas* framework. *Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla.*, 256 F.3d 1095, 1104 (11th Cir. 2001) *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir.2008); *see also Imaging Business Machines, LLC v. BancTec, Inc.*, 459 F.3d 1186, 1191 (11th Cir. 2006) (where a defendant's Rule 56 motion has not challenged an element of a claim, absent notice and an opportunity to be heard, a court may not grant summary judgment against a plaintiff based on the insufficiency of evidence to establish that element of his claim).

### B. THE BOARD'S LEGITIMATE, NON-DISCRIMINATORY REASON FOR PROMOTING COFFELT OVER KITCHENS

As there is no dispute about Kitchens' *prima facie* case, the burden of production shifts to the Board "to articulate a legitimate, nondiscriminatory reason for its actions." *Brown v. Ala. Dept. of Trans.*, 597 F.3d 1160, 1174 (11th Cir. 2010). "This burden is one of production, not persuasion . . . ." *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). "The defendant need not

persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (citation omitted). "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting *Burdine*, 450 U.S. at 257 (emphasis added)). The employer may rely on subjective evaluations as long as the employer provides "a clear and reasonably specific factual basis" for those evaluations. *Chapman v. AI Transp.*, 229 F.3d 1012, 1034 (11th Cir. 2000) (en banc).

The Board has proffered three different reasons for its promotion of Coffelt over Kitchens: (1) Kitchens was a bus driver who drove a route every day, which created scheduling conflicts, while Coffelt did not drive a bus; (2) Kitchens was a teacher at the Middle School, while Coffelt was a teacher at the High School; (3) Kitchens and Coffelt were interviewed twice and all interviewers recommended Coffelt be named as the varsity softball coach. Kitchens does not dispute that the reasons given by the Board satisfy its burden under the *McDonnell Douglas* test,

(doc. 17 at 9-10); nonetheless the Court briefly examines the grounds to conclude they satisfy the Board's burden of production.

From the Shaw and Humphries interviews it is apparent that the interviewers were concerned that the head varsity softball coach be present for the entirety of the practice. (*See* Kane Aff. ¶ 6; Powell Aff. ¶ 6; Shaw Aff. ¶¶ 19-20; Storie Depo at 105-06.; Humphries Depo. at 195-99.) Kitchens in both interviews stated she would continue to drive her bus route while coaching, where Coffelt did not drive a bus route. Kitchens was employed at the Middle School, which had a different schedule for class periods and also a different principal, making it more difficult for Humphries to work closely with and supervise Kitchens. Coffelt taught at the High School, and thus it would be easier for Humphries to work directly with him and schedule games and practices. Finally, all interviewers recommended Coffelt be hired over Kitchens. The interviewers cited Kitchens' bus route, her employment at the Middle School, as well as their greater experience in working with Coffelt, trust in Smith's recommendation of Coffelt, and belief that Kitchens had a poor attitude during the interviews. *See Chapman*, 229 F.3d at 1033-34 (interviewers' subjective perception of applicant's interview performance is a legitimate, non-discriminatory reason where grounds for perception are clear and

reasonably specific). The Court finds that the Board has proffered three legitimate, non-discriminatory reasons for hiring Coffelt over Kitchens.

## C. KITCHENS' FAILURE TO DEMONSTRATE THAT THE BOARD'S PROFFERED REASONS ARE PRETEXTUAL

If an employer carries its burden of producing a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination created by the *McDonnell Douglas* framework drops from the case and "the factual inquiry 'proceeds to a new level of specificity.'" *Brooks v. Cty. Comm'r*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *EEOC v. Joe's Stone Crab, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002)). "To avoid summary judgment, [the plaintiff] must introduce significantly probative evidence showing that the asserted reason[s given by the defendant are] merely a pretext for discrimination." *Brooks*, 446 F.3d at 1163 (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)). "However, a reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (quoting *Brooks*, 446 F.3d at 1163); *see also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) ("[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." (emphasis omitted)). A plaintiff can demonstrate that the employer's proffered reason is

pretextual by revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning. *Springer*, 509 F.3d at 1348. In determining whether a proffered reason is pretextual, courts are not in the "business of adjudging whether employment decisions are prudent or fair" but instead are solely concerned with "whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

Kitchens first argues that regardless of the Board's legitimate, non-discriminatory grounds for hiring Coffelt, the Board's hiring of Coffelt supports a finding of pretext because Coffelt was less qualified than her. The promotion of "a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting plaintiff was pretextual." *Alexander v. Fulton Cty.*, 207 F.3d 1303, 1340 (11th Cir. 2000). However, a plaintiff can show pretext by disparity in qualifications only where "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004)); *see also Brooks*, 446 F.3d at 1163 (quoting *Alexander v. Fulton County,* 207 F.3d 1303, 1339 (11th Cir. 2000)) ("[A] plaintiff cannot prove pretext by simply arguing or even by showing

that he was better qualified than the [employee] who received the position he coveted.").

Kitchens' argument fails because at its essence it simply quarrels with the wisdom of hiring Coffelt and the nondiscriminatory qualifications Humphries focused on. Kitchens argues her greater breadth and depth of experience coaching and playing softball made her dramatically more qualified for the position than Coffelt. She points to her "decades more experience" coaching softball than Coffelt. Kitchens finds support in Humphries statement that "she was the most qualified candidate for the position but that he did not want to set a precedent regarding being a head coach and driving a bus route at the same time." (Kitchens Aff. ¶ 8.)

The Court agrees that Kitchens has more experience coaching and playing softball than Coffelt, but a review of the testimony of the five interviewers shows that experience is only one of the many qualities that they sought in a coach. All interviewers agreed it was important for the coach to be present during the entire practice and Kitchens' bus route would prevent her from doing so.

While Humphries allegedly told Kitchens that "she was the most qualified candidate for the position," he immediately told her that the bus route was a determining factor. (Kitchens Depo. at 116.) Humphries' use of the words "most

qualified" need not confuse the legal question—whether "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Ash*, 546 U.S. at 457. Humphries' statement reveals that the bus route, and Kitchens' resulting absence from part of practice, was more important than the difference in the backgrounds of Coffelt and Kitchens. While Kitchens had more experience, Coffelt was "better qualified" when it came to availability. Using just the qualifications Humphries referred to in his conversation with Kitchens, and not even those identified in the Board's pleadings, the Court finds Kitchens has not shown an extreme gap in qualifications needed to prevail under the high standard described above.

As part of her qualifications argument, Kitchens asserts that the interviewers' belief that the bus route would prevent her from being present for the whole practice is mistaken, because "coaches are free to schedule games and practices as they like." (Doc. 17 ¶ 6.) Kitchens offers no proof that coaches have a final say in scheduling other than her own affidavit, while Humphries stated in his deposition that ultimately principals have the final say in scheduling matters. (Humphries Depo. at 232-33.) Construing this contradictory evidence in Kitchens' favor, the result of the Court's analysis does not change. Kitchens does not argue she informed any of the interviewers she would schedule the practice after her bus

route and only brings it up as a *post hoc* attack on the Board's reasons for choosing Coffelt. Humphries appeared to act under the assumption that Kitchens would begin her practice while she was conducting her bus route and would instruct her assistants to supervise practice. (*See* Kitchens Depo. at 85, 94.) Because an employer's mistaken belief still justifies a nondiscriminatory employment decision, Humphries' belief that Kitchens would miss part of her practice is enough to justify his decision. *Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001). Even if Humphries knew that Kitchens *could* start the practice after the bus route concluded, and thus be there for the whole practice, he stated this was a non-optimal schedule because students would get home too late and their academics would suffer as a result. (Humphries Depo. at 205.)

Kitchens seeks to argue in the alternative to her qualifications argument that each of the Board's given reasons for hiring Coffelt as the head coach are false and unworthy of credence. "In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Kragor*, 702 F.3d at 1307 (quoting *Chapman*, 229 F.3d at 1037). Kitchens must show that each of the three preferred reasons for Coffelt's hiring over her is pretextual in order to defeat summary judgment.

### i.   KITCHENS' BUS ROUTE AND EMPLOYMENT AT THE MIDDLE SCHOOL

#### a.  KITCHENS' COMPARATOR ARGUMENT

Kitchens first argument is that the Board's ground for not hiring her over Coffelt—her bus route—is pretextual, because the Board employed other coaches who had bus routes, and in any case Pouncey had told her that there was no rule against driving a bus and being a coach at the same time. (Doc. 17 at 12-13.) She argues that at the time of the hiring decision the Board employed twenty-seven coaches who also drove school buses, including five coaches who were head coaches of "major sports" such as soccer, basketball, and volleyball. *Id.* at 12.

Kitchens offers as comparators Chad Horn ("Horn") and James Poindexter ("Pointdexter"), both of whom coached at the High School in 2015. That year Horn taught at the Middle School, drove a bus, and was the cross-country coach and assistant baseball coach at the High School. (Humphries Depo. at 57-60; Kitchens Aff. ¶ 6.) In 2015, Poindexter taught at the Middle School and had been the head varsity basketball coach at the High School for years. Pointdexter started coaching the varsity basketball team when the Middle School and High School were combined as one school, and continued to teach once the school was divided into the Middle and High School. (Storie Depo. at 107.)

Identifying a comparator's disparate treatment can be used to prove pretext, in addition to the more widely known role of proving a prima facie case. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1277 (11th Cir. 2008); *Silvera*, 244 F.3d at 1259 (Court examined as part of plaintiff's pretext argument whether there was any disparate treatment of a similarly situated employee of a different race.). When evaluating an allegation of disparate treatment, the comparator must be "similarly situated to the plaintiff in all relevant respects." *Stone & Webster Const., Inc. v. U.S. Dept. of Labor*, 684 F.3d 1127, 1136 (11th Cir. 2012) (quoting *Rioux*, 520 F.3d at 1280). The Eleventh Circuit utilizes a "nearly identical" standard to determine whether the job-related characteristics and situation of two employees are sufficiently similar. *Stone*, 684 F.3d at 1134-35 (citing *Burke-Fowler*, 447 F.3d at 1323 n.2); *see also MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 774 n.16 (11th Cir. 1991). The "nearly identical" standard does not require that the comparators are the "plaintiff's dopplegangers" but requires "much more than a showing of surface-level resemblance." *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1340 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 2510 (2016).

Neither Horn nor Pointdexter are similarly situated, such that their treatment can be characterized as "nearly identical."[1] Humphries chose to hire Coffelt as the head softball coach, but had nothing to do with the hiring of Horn and Pointdexter, which occurred before Humphries arrived and involved a different decision-maker. *See Silvera*, 244 F.3d 1261 n.5 ("[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination."); *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."). *But see Rioux*, 520 F.3d at 1281-82 (different supervisors not dispositive).

At the time Pointdexter was hired to be the head coach of the varsity basketball team, he was working at the combined Middle and High School. When the Middle and High School split into separate schools, Pointdexter worked at the Middle School but retained his coaching position with the basketball team. Kitchens on the other hand was applying directly to become the head varsity softball coach while she worked at the Middle School. The circumstances of

---

[1] Kitchens has not advanced any developed argument that any of other twenty-five coaches who drive buses qualify as comparators in this case, outside of mentioning those coaches employed by the Board also drove buses. The Court declines to develop Kitchens' argument for her. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995) (The Court is not required "to distill [a] potential argument that could [have] be[en] made based upon the materials before it on summary judgment.").

Pointdexter and Kitchens' hiring processes differ so that they are not "nearly identical."

Horn is likewise not a valid comparator. It is unclear from the record when Horn was hired to be the cross-country coach, but in any case Humphries was not the decision-maker as he was in Kitchens' case. Humphries likewise stated a preference for head coaches of "major sports" not having school bus routes. (Shaw Aff. ¶ 19; Humphries Depo. at 82, 198-99.) Cross country is not a major sport according to Humphries, while softball is. Finally, Kitchens has not shown that there were any other teachers even willing to fill Horn's coaching role, where in her case, she was competing with other applicants for the position. Horn is thus not a valid comparator to Kitchens because he was hired at a different time, not a head coach of a major sport, and has unclear hiring circumstances.

Kitchens also argues her employment at the Middle School is a pretextual reason for not hiring her because Horn and Pointdexter also worked at the Middle School, but had coaching jobs at the High School. *Springer*, 509 F.3d at 1348. During his deposition Humphries said he was generally averse to hiring coaches who did not teach at the High School: "[T]here's only two reasons I would [select a coach that worked at a different school than the High School]. It's, one, there's a championship level coach that's willing to do it, . . . or there's just nobody else to

do it that's qualified to do it." (Humphries Depo. at 19-20.) The Board argues that Humphries did not hire Kitchens because she did not fall into one of the two exceptions. (Doc. 16 at 26-27.) Kitchens alleges that Horn and Pointdexter, who worked at the Middle School but coached at the High School during the time Humphries chose to not hire Kitchens, also do not fall into these two exceptions. Thus, according to her argument, Humphries' refusal to hire Kitchens because of her employment at the Middle School must be a pretext for his actual reason, sex discrimination.

Kitchens' argument fails because it mischaracterizes Humphries' statement. Humphries' self-imposed standard was that he would not *hire* a coach working as a teacher at another school unless one of the two conditions was satisfied. He said nothing about continuing to employ coaches who worked as teachers at another school that had been employed previous to his tenure at the High School. As stated above, when Pointdexter was hired he did work at the combined Middle and High School. Nor does Kitchens offer any evidence that Horn was (1) not a championship level coach or (2) that there were other persons at the High School willing to take the job. Kitchens has failed to show how the Board's proffered reasons, (1) the bus route and (2) Kitchens' employment at the Middle School, are pretextual and that discrimination is the actual reason.

### ii. THE INTERVIEWERS' PERCEPTION OF KITCHENS' AND COFFELT'S INTERVIEWS

Kitchens also argues the Board's third reason for not hiring her over Coffelt, that all interviewers felt that Coffelt was more qualified, is pretextual. She rests her argument on her conversations with Humphries that occurred after she found out that Coffelt was hired. Humphries allegedly told Kitchens she was the most qualified of the applicants and the bus route prevented her from being hired. According to Kitchens, Humphries's statement to Kitchens that she was most qualified contradicts the Board's argument that Humphries based his decision to hire Coffelt on Shaw, Powell, Kane, and Storie's recommendation to hire Coffelt; because the Board's argument is contradictory, a jury could find that sex discrimination is the real reason Coffelt and not Kitchens was hired.

There are three different versions of what Humphries told Kitchens in his office following his decision to employ Coffelt as head softball coach. Each version differs slightly. The most helpful version of Humphries statement to Kitchens was that her bus route was the *only* reason he hired Coffelt instead of her. (Kitchens Aff. ¶ 9.) Looking at the evidence in the light most favorable to Kitchens, i.e., the most favorable version of Humphries' statement, a reasonable jury could find Humphries' statement contradicts his argued reliance on the recommendations of the other interviewers to hire Coffelt. Thus, Kitchens has carried her burden to

show pretext for the Board's grounds that it did not hire her because of her poor interview performance.[2] By prevailing on this claim of pretext, Kitchens does not change the final result as she has failed to show that the Board's first and second legitimate, nondiscriminatory reasons for choosing Coffelt are pretextual.

## V.    CONCLUSION

Kitchens has failed to show that all legitimate, nondiscriminatory reasons for the Board's hiring of Coffelt instead of her were pretextual. As a result, the Board's motion for summary judgement is due to be GRANTED, and Kitchens' claims dismissed. An Order consistent with this Opinion will be entered separately.

    **DONE** AND **ORDERED** ON OCTOBER 19, 2017.

                                          _____
                                          L. SCOTT COOGLER
                                          UNITED STATES DISTRICT JUDGE
                                                                    190485

---

[2] Kitchens does not appear to argue that the Board's second ground for choosing Coffelt over Kitchens, her employment at the Middle School, was contradicted by Humphries' alleged statement that he did not hire Kitchens solely because of the bus route. This argument does not receive further attention, as it is not properly before the Court. *Resolution Trust Corp.*, 43 F.3d at 599. Even if Kitchens made such an argument, it would not change the final result as the Court finds that Kitchens' bus route is a legitimate, nondiscriminatory reason to hire Coffelt over her.